JOURNAL ENTRY AND OPINION
{¶ 1} In this consolidated appeal, Appellants Fernando Torres and Moises Torres appeal the Cuyahoga County Court of Common Pleas, Domestic Relations Division's judgment of divorce and division of marital property. Fernando Torres assigns eight errors for our review, while Moises Torres assigns two errors for our review.[1]
 {¶ 2} Having reviewed the record and pertinent law, we agree with the trial court on all the issues except the status of the property at 13801 Sherry Avenue, and the set-off request as it relates to the husband's personal property; consequently, we *Page 2 
affirm in part, and reverse in part the judgment of the court. The apposite facts follow.
 {¶ 3} Fernando Torres and Daisy Torres were married on March 18, 1983. The parties have a son, Ferdinand, who was emancipated at the time of the proceedings below. On February 2, 2004, Daisy filed for divorce, alleging gross neglect of duty, extreme cruelty, and incompatibility. Daisy also alleged that the parties had quitclaimed the marital residence to Fernando's brother, Moises Torres, without adequate consideration. On February 12, 2004, Daisy filed an amended complaint naming Moises as a defendant and alleging that the marital residence located at 13801 Sherry Avenue in Cleveland, Ohio, and titled to Moises, was marital property.
 {¶ 4} On February 26, 2004, Fernando filed his answer and counterclaim to Daisy's original complaint. In his answer and counterclaim, Fernando admitted that the marital residence was quitclaimed to Moises, but denied that it was without adequate consideration. Fernando also alleged that Daisy was guilty of adultery, extreme cruelty, gross neglect of duty, and domestic violence. Fernando further alleged that Daisy had broken into his garage and home and damaged his personal and real property.
 {¶ 5} The case proceeded to trial on October 28, 2004, and March 9 and 10, 2005. Prior to the trial, the parties made several stipulations including that the parties had quit-claimed the marital residence to Moises on October 19, 1989. The *Page 3 
parties also stipulated that on April 22, 1994, Third Federal Savings and Loan notified them that the mortgage on the marital residence was satisfied. The parties further stipulated that in July 1992, they purchased a farm located in Yauco, Puerto Rico, from Fernando's father, for the sum of $50,000. Finally, the parties stipulated that they had divided their personal property to their mutual satisfaction.
 {¶ 6} At trial, the central dispute involved the transfer of the marital residence to Fernando's brother, Moises. Daisy testified about the acquisition and subsequent transfer of the disputed property. Daisy testified that they bought the marital residence in the early part of 1989. Daisy testified that she could not remember how much they originally paid for the house, but recalled that they took out a mortgage loan for $13,000, which was to be paid back over a period of ten years.
 {¶ 7} Daisy also testified that later that same year, she and Fernando quitclaimed the house to his brother. The following testimony took place at trial:
 "Q. Why did you sign a quitclaim deed to Moises Torres?
 A. The reason I signed it was because at the time my husband Fernando was collecting Workman's [sic] Compensation. When he started collecting his first checks, he went and started work for a factory. He has a son name Fernando Torres just like his name. This is junior. He was collecting Workman's [sic] Comp with the social security number, and he was working at the factory under his son's social security number and eventually got caught. He was told by a lawyer that he might go to jail. It was a big possibility that he was going to jail because this was considered fraud and —
 "* * *
 "A. Okay. In order for me and my son not to be out on the streets and in order to save the house, we talked about it and we agreed we would *Page 4 
sign it over to his brother until this was all over, so that we wouldn't lose the house because since he was told he was going to jail, it was a big possibility. I figured if he goes to jail, I have a place to live with my son. I would not be thrown out in the street."[2]
 {¶ 8} Daisy further testified that sometime after they bought the marital residence, Moises telephoned from Puerto Rico and informed Fernando that their father was very ill. Moises also indicated that their father wanted to sell the farm. Daisy testified that she did not recall exactly when they received the telephone call from Moises. However, Daisy testified that in 1992, they bought the farm for $50,000 with money that Fernando had in the bank.
 {¶ 9} At trial, Fernando testified that the proceeds from the sale of the marital residence was used to acquire the farm in Puerto Rico. Fernando testified as follows:
 "Q. You said that you and your brother, Moises had an arrangement regarding the farm in Yauco, and the house on 13801 Sherry Avenue, was that arrangement ever reduced in writing between you and your brother?
 A. It never did. It was a family deal.
 Q. And, please tell me your understanding of that arrangement?
 A. In 19 —
 "* * * *Page 5 
"The Magistrate: What was the deal?
 Defendant/Husband: Okay. In 1989, a little bit after we bought the house, I had a phone call from Puerto Rico that my father had a few strokes, and the doctor told the family, if he get another one, like a big stroke, he probably going to die. So at the time, it was so many kids, like 18 sons, so it was hard for him to split the land between all of the kids, so his lawyer suggested that if he sell the farm and give so much amount to every son. So at the time, nobody wanted to farm, and my father called me and asked, if I want to farm. I told him I just didn't want to farm, because my mother was there, and I didn't have the money, but I had that house. And then I call Moises, my brother, and told him, if he give me the money for the house, I will buy the land, because we plan to move to Puerto Rico and build a house in Puerto Rico. So he agreed to do that, because he — his son was here, and we were going to take care of the house. So —
 The Magistrate: I am sorry. You told Moises that if you give me the money for your Cleveland house, then what?
 Defendant/Husband: He was going to give it to my father in Puerto Rico. He wasn't going to send it away. It was a family deal. He was going to give it to my father in Puerto Rico.
 The Magistrate: Why wouldn't your father just go to Moises if Moises had the money?
 Defendant/Husband: Because Moises did not want the farm, and my mother is not Moises' mother."[3]
 {¶ 10} Fernando also testified that in 1989, after he and Daisy quitclaimed the marital residence to his brother, Moises gave their father $38,000 as partial payment *Page 6 
for the farm. Fernando stated that he and Moises agreed on the sum of $38,000, because that was the price he and Daisy had paid for the marital residence. Fernando stated that in 1992, he paid his father an additional $12,000 to complete the purchase.
 {¶ 11} Fernando further testified that after quitclaiming the house to Moises and acquiring the farm in Puerto Rico, he and Daisy remained in the house, made improvements, and repairs in lieu of rent. In addition, he kept paying the mortgage until the loan was paid in full. Fernando stated that Moises subsequently gave him power of attorney to list the house for sale and to collect the proceeds on his behalf.
 {¶ 12} Finally, Fernando testified that as a result of a work-related accident in 1986, he began receiving Workers' Compensation benefits. Fernando stated that in August of 1994, he was indicted for theft, because he was working while receiving Workers' Compensation benefits. Fernando stated that he was subsequently convicted of theft and ordered to pay restitution to the State of Ohio in the amount of $21,330.
 {¶ 13} On October 13, 2005, the magistrate issued a decision, which found that the marital residence was marital property. Both Fernando and Moises filed objections to the magistrate's decision. On July 11, 2006, the trial court adopted the magistrate's decision in its entirety.
 Marital Property *Page 7 {¶ 14} Initially, we note that the standard of review for the determinations made in divorce cases is generally the abuse of discretion standard.[4] The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.[5] However, the characterization of property as separate or marital is a mixed question of law and fact, not a discretionary matter.[6] Hence, we review the determination regarding the proper characterization of property under the manifest weight of the evidence standard.[7] With these principles in mind, we proceed to address Fernando's and Moises' assigned errors, which will be discussed together and out of order where appropriate.
 {¶ 15} We will address Fernando's fourth, fifth, and sixth assigned errors together with Moises' two assigned errors, because they encompass similar propositions of fact and law. In these assigned errors, both Fernando and Moises argue that the trial court erred when it determined that the house located at 13801 Sherry Avenue in Cleveland, Ohio was marital property. We agree. *Page 8 
 {¶ 16} In a divorce action the trial court must determine which property is marital and which property is separate.[8] Marital property generally includes income and appreciation on separate property due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage.[9] Upon making its determination, the court shall divide the marital property equitably between the spouses and disburse a spouse's separate property to that spouse.[10]
 {¶ 17} In the instant case, the trial court adopted the magistrate's determination that the house, at issue, was marital property. The magistrate's determination was based in large part on Daisy's testimony regarding the acquisition of the property and subsequent transfer. Daisy testified that she agreed to transfer the property to Moises as a precautionary measure because there were pending Workers' Compensation fraud charges against Fernando, which could result in them losing the house. We are not persuaded.
 {¶ 18} Here, the record indicates that the house was bought in March 1989 and transferred approximately six months later to Moises. Although Daisy testified that she agreed to transfer the house to Moises, because of pending criminal charges against Fernando, the record belies those assertions. The record before us *Page 9 
indicates that the parties stipulated that Fernando was not indicted for Workers' Compensation fraud until 1994. Since Fernando was not indicted until five years after the transfer of the house, fear of losing the property could not have been the overriding reason for the transfer.
 {¶ 19} On the contrary, Fernando testified that shortly after he and Daisy bought the house in Cleveland, Ohio, they received word that his father was ill and needed to sell the farm. Fernando testified that he and Daisy decided to buy the farm for $50,000, a fact which both parties stipulated to prior to trial. Fernando testified that they transferred the house to his brother, Moises, for the sum of $38,000, which represented the purchase price of the house. Moises in turn, gave the father $38,000, on their behalf, towards the purchase of the farm. Fernando testified that he subsequently paid his father the remaining $12,000 to complete the purchase of the farm.
 {¶ 20} Daisy disputes Fernando's assertions, and maintains that they acquired the farm with money that Fernando had in the bank. However, Daisy offered no evidence to substantiate that Fernando had $50,000 in a bank account at the time they acquired the farm. Therefore, it is reasonable for us to infer that it is more plausible than not, that the parties traded the marital residence for the farm in Puerto Rico. *Page 10 
 {¶ 21} We conclude on the evidence before us that the house located at 13801 Sherry Avenue in Cleveland, Ohio was transferred to Moises in order to acquire the farm in Puerto Rico. Daisy's stated reason for the transfer of the marital residence is not credible, because Fernando was not indicted for Workers' Compensation fraud until five years after the now disputed transfer.
 {¶ 22} We also conclude that the trial court erred in concluding that the transfer was fraudulent. The record before us indicates that Daisy knew that she and Fernando were transferring all rights in the marital residence to Moises. The following exchange took place at trial:
 "Q. Just so we understand your argument — you don't deny you signed the deed?
 A. No, I don't.
 Q. You don't deny that deed was signed in front of two witnesses?
 A. I don't deny that I signed it.
 Q. You don't deny that the house went into the name of Moises Torres?
 A. No, I don't deny that. *Page 11 
 Q. And you knew that by signing that deed, you were conveying all of your right, title and interest in the property to Moises Torres?
 The Magistrate: Do you understand the question?
 The Witness: Yes.
 The Magistrate: You were conveying all of your interest to —
 The Witness: There was a purpose to that. That's the reason.
 The Magistrate: Just answer the question.
 The Witness: Yes, I did."[11]
 {¶ 23} Despite the above testimony, which indicates that Daisy knowingly signed the quitclaim deed transferring the house to Moises, the magistrate concluded that the transfer was fraudulent. The magistrate based her conclusion on the fact that Moises never paid the mortgage, never lived in the house, and Fernando arranged and paid for all the repairs and renovations. However, the basis for the magistrate's conclusion is not dispositive of fraud.
 {¶ 24} Here, Fernando testified that they bought the house for $38,000 and obtained a mortgage for $13,000. Fernando further testified that he continued to pay the mortgage because Moises agreed to pay $38,000 to the father as partial payment for the farm. We conclude that Fernando had to satisfy the mortgage to honor the agreed on price of $38,000. We also do not find that Moises had to live in the house to make it a valid transfer. The record does not indicate that Daisy and Fernando lived on the farm after acquiring it from the father for $50,000. Finally, Fernando *Page 12 
testified that he paid for the renovations and repairs in lieu of paying rent to his brother Moises. This is not uncommon in transactions among family.
 {¶ 25} We conclude on the evidence before us that the marital residence was validly transferred to Moises in order for Fernando and Daisy to acquire the farm. Fernando's stated reason for transferring the house to Moises is reasonable. If an argument exists that can support Fernando's position, it is not this court's duty to root it out.[12]
 {¶ 26} Moreover, even if we accept Daisy's contention that the house was transferred to put it beyond the reach of creditors, Daisy cannot prevail. Daisy, by her own admission, participated in a plan to defraud creditors. It is well established that "neither party to a fraudulent [agreement] can be aided in a court of justice, but that they will be left in exactly that position in which they have placed themselves by their conniving and fraudulent transactions."[13] Daisy, having participated in an alleged scheme to defraud creditors, cannot now rely upon the equitable jurisdiction of the courts to relieve her from her bargain.[14] *Page 13 
 {¶ 27} Consequently, the trial court erred in concluding that the house located at 13801 Sherry Avenue in Cleveland, Ohio was marital property. Accordingly, we sustain Fernando's fourth, fifth, and sixth assigned errors, along with the two errors Moises assigned.
 Service of Process {¶ 28} In the first assigned error, Fernando argues the trial court erred when it found that he was personally served by process server Hans Schmidt. We disagree.
 {¶ 29} The service of process is governed by Civ.R. 3(A), which states that "[a] civil action is commenced by filing a complaint with the court, if service is obtained within one year from such filing."[15]
The methods of service are governed by Civ.R. 4.1, which provides for service by certified mail, personal service, or residence service.[16]
 {¶ 30} Personal service is controlled by Civ.R. 4.1(B), which states in pertinent part:
 "When the plaintiff files a written request with the clerk for personal service, service of process shall be made by that method.
 * * *
 "The person serving process shall locate the person to be served and shall tender a copy of the process and accompanying documents to the *Page 14 
person to be served. When the copy of the process has been served, the person serving process shall endorse that fact on the process and return it to the clerk who shall make the appropriate entry on the appearance docket."[17]
 {¶ 31} At trial, Hans Schmidt testified that he was a special process server for Cuyahoga County's Domestic Relations Court. Schmidt testified that on February 9, 2004, he personally served Fernando with process. Schmidt testified in pertinent part as follows:
 "I knocked on the side door, some children answered the front door. I asked if Fernando was here, and they said, wait a minute. I believe, they ran downstairs, Mr. Torres came up the stairs. I gave him the papers. I said, `Are you Fernando?' And he said `Yes.' I gave him the papers. He looked at them, and said, `What are these?' And I said, `They are self-explanatory.' And he says, `Oh, I am not Fernando. I am Luis.'"[18]
 {¶ 32} Schmidt also testified that he viewed a photograph of Fernando prior to serving him with the Complaint. We conclude on the evidence before us that Fernando was the individual who Schmidt served on February 9, 2004. Accordingly, we overrule the first assigned error.
 Temporary Spousal Support *Page 15 {¶ 33} In the second and third assigned errors, Fernando argues the trial court erred when it found that neither party presented sufficient evidence to warrant a retroactive modification of the temporary spousal support order. Further, the trial court erred when it failed to terminate said order retroactively to February 2, 2004. We disagree.
 {¶ 34} A trial court is generally afforded wide latitude in deciding spousal support issues.[19] The trial court is provided with broad discretion in deciding what is equitable upon the facts and circumstances of each case, but such discretion is not unlimited.[20]
 {¶ 35} In making a spousal support determination, a trial court must consider the enumerated factors set forth in R.C. 3105.18(C)(1), which include the income of the parties, the earning abilities of the parties, their physical, mental, and emotional conditions, their ages, the retirement benefits of the parties, the length of the marriage, the standard of living of the parties during the marriage, the education of the parties, and the assets and liabilities of the parties.[21]
Further, a trial court must determine whether there is a need for spousal support and, if so, the amount needed and the duration of the need.[22] *Page 16 
 {¶ 36} In the instant case, the record reveals that on March 25, 2004, Fernando was ordered to pay temporary spousal support in the amount of $400 per month. After reviewing the factors enumerated in R.C.3105.18(C)(1), the magistrate concluded that no future support was warranted. We find that the magistrate's decision was supported by the record. The magistrate found that Daisy was 44 years old and Fernando was 50 years old. The magistrate also found that the parties stipulated that Daisy had a high school education and Fernando had a ninth grade education from Puerto Rico. In addition, the magistrate found that the parties stipulated that Daisy was currently employed as an operating room assistant earning approximately $21,677 to $23,000 per year, and Fernando claimed a net income, after expenses, of $12,022 in tax year 2002.
 {¶ 37} Based on the above evidence, the magistrate concluded that it was impossible to determine from the evidence presented which party had the greater earning ability. Our review of the record indicates that both parties appear to be self-sustaining. Consequently, the trial court correctly found that no future spousal support was necessary.
 {¶ 38} Fernando also argues that the trial court should have terminated the temporary support order effective February 2, 2004. We conclude that Fernando was not prejudiced by the trial court's failure to terminate the support order retroactive to *Page 17 
February 2, 2004. A temporary support order is merely an order to provide for the needs of the parties during the pendency of the divorce action.[23] Here, the record is devoid of any indication that Fernando paid any spousal support during the pendency of the matter, and the trial court did not hold him in contempt for his failure to abide by the order. Consequently, we find that this contention is without merit. Accordingly, we overrule the second and third assigned errors.
 Set-off for Property Damage {¶ 39} In the seventh assigned error, Fernando argues the trial court erred in awarding a set-off for the property damage Daisy caused to his personal property. We agree.
 {¶ 40} In the instant case, at trial, Daisy admitted that in her anger, she deliberately damaged Fernando's 1958 Volkswagen Beetle, 1996 Volvo tractor trailer, and his brother's 1970 Monte Carlo. The magistrate found that although Fernando presented evidence of the repair costs for the Volkswagen and Volvo, he did not present any evidence how the damage reduced the fair market value of the vehicles. We are not persuaded.
 {¶ 41} Fernando testified that when the parties separated, the Volkswagen was worth approximately $5,500 and the Volvo was worth approximately $6,750. *Page 18 
Fernando provided the magistrate with written estimates for the repair costs for both vehicles.
 {¶ 42} We conclude that Fernando provided sufficient evidence for the magistrate to determine a set-off figure. The record before us include pictures of the vehicles clearly depicting the damage done. The magistrate's failure to award some amount of set-off for the damage that Daisy testified that she willfully caused, was an abuse of discretion. Accordingly, we sustain the seventh assigned error.
 Criminal Restitution {¶ 43} In the eighth assigned error, Fernando argues the trial court erred when it ordered him to pay the full restitution for his theft conviction. We agree.
 {¶ 44} R.C. 3105.171(F) sets forth the following factors for the trial court to consider in making a division of marital property:
 "(1) The duration of the marriage; (2) The assets and liabilities of the spouses; (3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage; (4) The liquidity of the property to be distributed; (5) The economic desirability of retaining intact an asset or an interest in an asset; (6) The tax consequences of the property division upon the respective awards to be made to each spouse; (7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property; (8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses; (9) Any other factor that the court expressly finds to be relevant and equitable."[24] *Page 19 
 {¶ 45} Because the division of marital debt is "inextricably intertwined" with the division of marital property, we conclude that the same factors are relevant in fashioning an equitable distribution of marital debt.[25] Here, the trial court ordered Fernando to pay the full restitution fees resulting from his theft conviction. We conclude that there was no abuse of discretion in holding Fernando solely responsible for the restitution fees. This is the original penalty for his unlawful act. If a prison term had been ordered in lieu of restitution, Fernando would have been the party obligated to serve the sentence. Accordingly, we overrule the eighth assigned error.
Judgment affirmed in part, reversed in part and remanded to the trial court for further proceedings consistent with this opinion.
It is ordered that appellant and appellee share the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 20 
KENNETH A. ROCCO, P.J., and CHRISTINE T. McMONAGLE, J., CONCUR
 APPENDIX
Fernando Torres' Assigned Errors "I. The trial court erred when it found that husband was served personally with process by Hans Schmidt, contrary to the evidence."
 "II. The trial court erred when it found that neither party presented sufficient evidence to warrant retroactive modification of the temporary support order."
 "III. The trial court erred when it did not terminate the temporary support order retroactively to February 2, 2004."
 "IV. The trial court erred when it set aside the real estate deed to defendant Moises Torres
 A). The finding of fraudulent conveyance is not supported by the evidence;
 B). The deed is presumed to be valid and cannot be set aside except upon clear and convincing evidence;
 C). Husband's motivation in transferring the real estate was not to `shield the property from being lost as a result of a criminal investigation,' but was a trade to purchase real property in Puerto Rico." *Page 21 
 "V. The trial court erred when it awarded wife both a one-half interest in the Cleveland house and a one-half interest in the Puerto Rico property."
 "VI. The trial court erred when it found that the Sherry Avenue property was a fraudulent transfer and that wife's `fraud' is subordinate to husband's."
 "VII. The trial court erred when it did not award Appellant Fernando Torres a set-off for the property damage to the Monte Carlo, the 1958 Volkswagen and the Volvo truck."
 "VIII. The trial court erred when it ordered Appellant Husband to pay the full restitution for the theft conviction, $15, 830.42, which was incurred during the marriage and is marital debt."
 Moises Torres' Assigned Errors.
 "I. The trial court erred when it found that the transfer of the real estate located in Cleveland, Ohio (13801 Sherry Avenue) was fraudulent, thus not valid."
 "II. The trial court erred when it found that the real estate located in Cleveland, Ohio (13801 Sherry Avenue) was a marital property and not separate property."
[1] See Appendix.
[2] Tr. at 21-23.
[3] Tr. at 183-185.
[4] Yasinow v. Yasinow, Cuyahoga App. No. 86467, 2006-Ohio-1355.
[5] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217.
[6] Ervin v. Ervin, 4thDist. No. 06CA822,2006-Ohio-5460, citing Barkley v. Barkley (1997), 119 Ohio App.3d 155,159.
[7] Wylie v. Wylie (May 30, 1996), 4thDist. No. 95CA18;Miller v. Miller (Dec. 1, 1993), 4thDist. No. 93CA7.
[8] Dudich v. Dudich, Cuyahoga App. No. 84742, 2005-Ohio-889. See, also, R.C. 3105.171(B).
[9] Id. See, also, R.C. 3105.171(A)(3)(a)(iii).
[10] Id. See, also, R.C. 3105.171(C), (D).
[11] Tr. at 74.
[12] Henley v. Henley, 9thDist. No. 05CA0053,2006-Ohio-3336 citing Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 18673, at 22.
[13] Ratliff-Wooten v. Wooten, 4thDist. No. 00CA1, 2000-Ohio-2004, citing Pride v. Andrew (1894), 51 Ohio St. 405,414.
[14] See, e.g., Gambill v. Gambill (Jan. 31, 1991), 2ndDist. No. 89 CA 70.
[15] Madorsky v. Radiant Telecom, Inc., Cuyahoga App. No. 87231,2006-Ohio-6409.
[16] Maryhew v. Yova (1984), 11 Ohio St.3d 154, 159.
[17] Davis v. Davis, Cuyahoga App. No. 82343, 2003-Ohio-4657.
[18] Tr. at 270.
[19] Bolinger v. Bolinger (1990), 49 Ohio St.3d 120.
[20] Cherry v. Cherry (1981), 66 Ohio St.2d 348, 355.
[21] Stallsmith v. Stallsmith (Apr. 13, 1994), 3rd
Dist. No. 9-93-59.
[22] Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 68-69.
[23] Schumann v. Schumann, Cuyahoga App. Nos. 83404 83631,2005-Ohio-9.
[24] Elliott v. Elliott, 4thDist. No. 05CA2823,2005-Ohio-5405.
[25] See Samples v. Samples, 4th Dist. No. 02CA21, 2002-Ohio-5441. *Page 1