[Cite as *Strauss v. Strauss*, 2011-Ohio-3831.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 95377

## JULIE A. STRAUSS

PLAINTIFF-APPELLEE

vs.

## MARC I. STRAUSS, ET AL.

DEFENDANTS-APPELLANTS

### JUDGMENT:
### AFFIRMED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CP-D-311479

**BEFORE:**   E. Gallagher, J., Blackmon, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**    August 4, 2011

## ATTORNEYS FOR APPELLANT

Jaye M. Schlachet
55 Public Square
Suite 1600
Cleveland, Ohio    44113

Eric M. Levy
55 Public Square
Suite 1600
Cleveland, Ohio    44113

## ATTORNEYS FOR APPELLEE

Joseph G. Stafford
Gregory J. Moore
Stafford & Stafford Co., L.P.A.
55 Erieview Plaza, 5th Floor
Cleveland, Ohio    44114

### Attorney for Guardian Ad Litem

John H. Lawson
Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio    44103

### Attorney for Receiver

Richard A. Rabb
McCarthy, Lebit, Crystal & Liffman
101 West Prospect Avenue
Suite 1800
Cleveland, Ohio   44115

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Marc I. Strauss ("Husband") appeals from the judgment entry of divorce entered in the Cuyahoga County Court of Common Pleas, Domestic Relations Division on June 8, 2010. Husband argues that the trial court erred in awarding plaintiff-appellee Julie Strauss ("Wife") the status of primary residential parent and legal custodian of the parties' minor child, P.S. Husband additionally argues that the trial court erred in dividing the parties' marital property and in assigning him costs and attorney fees generated during the divorce. For the following reasons, we affirm the decision of the trial court.

{¶ 2} The parties married on March 31, 2001 and have one child, P.S., born as issue of the marriage. During the course of their marriage, Wife worked part- time as a perfusionist at Parma Community General Hospital, operating a heart/lung machine during open heart surgery. Husband worked part time as an attorney and engaged extensively in real estate investment

ventures.

{¶ 3} In 2004, the parties separated and Husband vacated the marital home in Solon, Ohio. Prior to the time of the parties' separation, the couple maintained an upper class standard of living. The parties attempted to reconcile during 2004 and 2005, but ultimately separated permanently in August of 2005. On July 13, 2006, Wife filed a complaint for divorce. On August 14, 2006, Husband answered the complaint and filed a counterclaim.

{¶ 4} On July 13, 2006, the trial court issued a restraining order that restrained Husband from engaging in various financial transactions including encumbering his ownership in the marital home, transferring or encumbering his ownership interest in various real estate ventures, and alienating, encumbering, borrowing against, transferring, or disposing of any of Wife and Husband's property or any assets that Husband might own or possess. The restraining order further prohibited Husband from re-entering the marital home, entering the premises of Wife's employer, and from harassing the Wife. The trial court appointed a guardian ad litem for the parties' minor child on August 23, 2006, and appointed a receiver to conduct business valuations on July 18, 2007.

{¶ 5} The case came to be heard on the issue of custody on October 1 and October 2, 2009. The trial resumed on February 9, 2010 on the issue of

the division of marital property. The trial court also heard Wife's motion for attorney fees.

{¶ 6} The trial court issued its judgment entry of divorce on June 8, 2010, wherein the court named Wife primary residential parent and legal custodian of the parties' minor child. In regard to the division of marital property, the trial court found that Wife established economic misconduct on the part of Husband under R.C. 3105.171(E) justifying a distributive award. The trial court awarded Wife the sum of $500,000 as her share of the marital property, together with the contents of the former marital home. The trial court awarded Wife an additional $100,000 of marital property in her possession along with $80,000 of non-marital separate property. Husband received his post-marital residence and his other real estate, partnership, corporate, and trust holdings. As part of the distributive award, Husband was ordered to sell the marital home along with other property and pay the proceeds towards Wife's $500,000 judgment, or alternatively, retain the property and pay Wife $70,000 of the $500,000 award within 60 days. Husband was ordered to replace $55,688 in P.S.'s 529 college account that Husband had liquidated during the pendency of the divorce proceedings. Husband was ordered to pay $200,000 of Wife's outstanding $230,000 in legal fees. The trial court also ordered Husband to pay the fees of the guardian ad

litem, the receiver, the receiver's attorney fees, and court costs. It is from this order that Husband presently appeals, asserting the four assignments of error contained in the appendix to this opinion.

## I. Allocation of Parental Rights.

{¶ 7} Husband's first assignment of error asserts that the trial court abused its discretion in allocating parental rights and erred by awarding Wife the status of primary residential parent and legal custodian of the parties' minor child.

{¶ 8} When reviewing a ruling pertaining to the allocation of parental rights, the trial court is to be afforded great deference. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." Id. at 74 (internal citations omitted).

{¶ 9} An appellate court must uphold the trial court's allocation of

parental rights and responsibilities absent an abuse of discretion, which implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Mason v. Mason*, Cuyahoga App. No. 80368, 2002-Ohio-6042, citing *Masters v. Masters* (1994), 69 Ohio St.3d 83, 630 N.E.2d 665. Accordingly, absent a clear showing of an abuse of discretion, we will not reverse the trial court's judgment.

{¶ 10} Provisions for the allocation of parental rights and responsibilities are set forth in R.C. 3109.04, and the statute expresses a strong presumption that shared parenting is in the best interest of the child. *Dietrich v. Dietrich*, Cuyahoga App. No. 90565, 2008-Ohio-5740. The presumption in favor of shared parenting can be overcome, however, by evidence showing that shared parenting would not be in the child's best interests. See R.C. 3109.04(A)(1.) A "best interests" determination is at all times reposed in the court's discretion, and a decision that shared parenting is not in a child's best interest is reviewable only for an abuse of that discretion. *Kong v. Kong*, Cuyahoga App. No. 93120, 2010-Ohio-3180, citing *Braatz v. Braatz* (1999), 85 Ohio St.3d 40, 45, 706 N.E.2d 1218.

{¶ 11} In determining the best interests of a child, the court is to consider all relevant factors, including, but not limited to, those factors set forth in R.C. 3109.04(F)(1). Also, in determining whether shared parenting is in the best

interests of the child, the court is to additionally consider the relevant factors enumerated under R.C. 3109.04(F)(2).   R.C. 3109.04(F)(1) and (2) provide the following factors for a trial court to consider:

"(1) * * * (a) The wishes of the child's parents regarding the child's care;

"(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

"(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

"(d) The child's adjustment to the child's home, school, and community;

"(e) The mental and physical health of all persons involved in the situation;

"(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

"(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

"(h) Whether either parent or any member of the household of either

parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

"(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other

parent's right to parenting time in accordance with an order of the court;

"(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

"(2) * * * (a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

"(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

"(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

"(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

"(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem."

**{¶ 12}** The trial court's judgment entry of divorce reveals that the court's decision to designate Wife as the residential parent and legal custodian of P.S. was based upon the inability of Husband to communicate and cooperate with Wife in regard to P.S. without verbally abusing or threatening her, his inability to comply with court orders including child support and visitation time, and the guardian ad litem's positive testimony of Wife as a parent. It is clear from the trial court's adoption of many of the suggestions in the guardian

ad litem's report that the court placed significant weight on the recommendations of the Guardian.

{¶ 13} A review of the record reveals that the trial court's determination is indeed supported by competent, credible evidence. The guardian ad litem described Wife as a "very good mother" who "puts [P.S.'s] needs first." (Oct. 1, 2009 Tr. 22.) She is "extremely objective," possessing genuine concern for P.S.'s situation. (Oct. 1, 2009 Tr. 90.) Wife does not yell and scream and does not raise her voice. (Oct. 1, 2009 Tr. 34.) She is non-confrontational. Though Wife has Multiple Sclerosis it does not affect her parenting of P.S. (Oct. 2, 2009 Tr. 316.)

{¶ 14} Husband is an attorney involved in real estate and currently employed with the Tanglewood National Golf Club. The guardian ad litem stated that Husband is more than a "standard visitation dad." (Oct. 1, 2009 Tr. 137.) Husband and P.S. have a loving relationship. (Oct. 1, 2009 Tr. 115.) Husband wants to spend time with P.S and P.S. enjoys spending time with his father. (Oct. 1, 2009 Tr. 115.) P.S. also has a close big brother relationship with his two half-sisters, which are Husband's daughters from his current relationship. (Oct. 1, 2009 Tr. 116.)

{¶ 15} Under R.C. 3109.04(F)(2)(a), a primary factor to be considered when determining whether shared parenting is in the best interest of a child is

"the ability of the parents to cooperate and make decisions jointly." *Sadowski v. Sadowski*, Cuyahoga App. No. 88929, 2007-Ohio-5061, at ¶15. In the case sub judice, extensive testimony was heard from the guardian ad litem, Wife, and even Husband regarding Husband's inability to communicate productively with Wife regarding P.S.

{¶ 16} The guardian ad litem testified that the parties have had nonstop conflict over visitation issues. (Oct. 1, 2009 Tr. 88.) The parties are often unable to agree on matters and need the guardian ad litem to intervene. (Oct. 1, 2009 Tr. 31.) The guardian ad litem testified that Husband has created conflict in the case while Wife has attempted to shield P.S. from such conflict. (Oct. 1, 2009 Tr. 38.) In one such instance, despite mediation assistance from the guardian ad litem, the parties were unable to reach an agreement in regard to P.S. Husband made threats resulting in a court order restraining Husband from picking P.S. up at school so as to avoid P.S. being treated like a "football" in the divorce dispute. (Oct. 1, 2009 Tr. 28.)

{¶ 17} The guardian ad litem testified that mediating disputes with Husband is challenging as he will make demands when he knows Wife will never agree. (Oct. 1, 2009 Tr. 144.) Wife testified that communication is a big problem with Husband. If he doesn't get his way he talks over Wife, yelling at her and threatening her. (Oct. 2, 2009 Tr. 324.)

{¶ 18} P.S. suffers from high anxiety issues. Extensive testimony was heard regarding an incident wherein Husband was ordered to return P.S., six years old at the time, from an out of town vacation earlier than Husband desired. Husband indicated to Wife that he intended to put P.S. on a commercial flight home, by himself, and that a third party would pick him up at the airport and return him to the marital home. Husband, however, drove P.S. home without telling Wife of the travel plans, keeping her in the dark during the incident. (Oct. 1, 2009 Tr. 39-43, 270-276.) Husband testified that he didn't think it was a big deal to communicate his change of plans to Wife and let her know that he in fact did not put P.S. on a plane by himself. (Oct. 1, 2009 Tr. 276.) The guardian ad litem characterized the situation as one involving an "element of torture" from Husband towards Wife. (Oct. 1, 2009 Tr. 44.)

{¶ 19} The guardian ad litem testified that Husband engages in verbal abuse towards Wife including hostile and demeaning emails and text messages. (Oct. 1, 2009 Tr. 26, 28, 29, 30, 36.) Husband himself admitted to calling Wife a "bitch", "asshole", "f***ing bitch" and "c***." (Oct. 1, 2009 Tr. 241.) Though P.S. never indicated to the guardian ad litem that he witnessed name calling (Oct. 1, 2009 Tr. 46), Wife testified that Husband was verbally abusive towards her and confrontational without regard to P.S.'s presence.

(Oct. 2, 2009 Tr. 319.) Wife testified that Husband called her a "bitch" on Mother's Day in front of P.S. (Oct. 2, 2009 Tr. 320) and that Husband gave her "the finger" in front of P.S. at a T-Ball function. (Oct. 2, 2009 Tr. 322.)

{¶ 20} The guardian ad litem testified that Husband tends to lose his temper and that "he does get quite out of control." (Oct. 1, 2009 Tr. 46, 69.) The guardian ad litem further testified that Husband threatened, on more than one occasion, to have him disbarred and sanctioned during the divorce case. (Oct. 1, 2009 Tr. 92.) The guardian ad litem has also witnessed Husband threaten others including the Receiver in the case. (Oct. 1, 2009 Tr. 70.) It was necessary for the guardian ad litem to reassure P.S.'s speech therapist that Husband was not a physical threat. (Oct. 1, 2009 Tr. 24.) Husband himself acknowledged that he occasionally engages in bad behavior (Oct. 1, 2009 Tr. 244), and stated that the guardian ad litem testified accurately regarding his behavior. (Oct. 1, 2009 Tr. 305.) Husband acknowledged an email wherein he threatened to keep Wife in litigation for 12 years. (Plaintiff's Exhibit 63, Oct. 1, 2009 Tr. 245-246.) The guardian ad litem viewed Husband's bullying conduct as not good for P.S. and stated that Husband needs to be a better role model. (Oct. 1, 2009 Tr. 94.)

{¶ 21} Beyond the parties' inability to communicate and resolve disputes concerning P.S., extensive testimony was heard at trial regarding Husband's

inability to abide by court orders. In determining the best interests of a child, R.C. 3109.04(F)(1)(f) instructs the trial court to consider, "[t]he parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights."

{¶ 22} At trial, the guardian ad litem testified that Husband has a problem following court orders. (Oct. 1, 2009 Tr. 78.) In regard to visitation orders, Husband is often not on time. (Oct. 1, 2009 Tr. 23, 32.) The guardian ad litem testified that Husband is often late picking P.S. up and late returning him to Wife. (Oct. 1, 2009 Tr. 79.) Husband did not deny this charge. (Oct. 1, 2009 Tr. 267.) In contrast to Husband, the guardian ad litem testified that Wife is good at following his directions and recommendations and that she follows directions even when not happy about it. (Oct. 1, 2009 Tr. 91.)

{¶ 23} Beyond visitation times, Husband admitted that he took P.S. into one of his *personal* counseling sessions despite a court order that prohibited P.S. from being taken for any further evaluations or appointments with any counselor. (Oct. 1, 2009 Tr. 258.) Husband additionally admitted that he violated a court order by appearing at Wife's place of employment. (Oct. 1, 2009 Tr. 260-261.) In contrast, when asked, Husband was unable to cite a single instance where Wife did not follow court orders. (Oct. 1, 2009 Tr. 303.)

{¶ 24} Another best interests factor under R.C. 3109.04(F)(1)(g) is

"[w]hether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor." Husband admitted that he had been found in contempt of court for failing to pay child support. (Oct. 1, 2009 Tr. 225.) Husband failed to purge himself of the contempt by paying the arrearage within thirty days as ordered by the court. (Oct. 1, 2009 Tr. 225.) Husband only purged his contempt and paid the arrearage on his child support when the court indicated it would have him arrested. (Oct. 1, 2009 Tr. 226.) Further, despite a court order restraining Husband from "alienating, encumbering, borrowing against, transferring, giving away, destroying, or disposing of any of the Plaintiff's and [Defendant's] property or any assets that the Defendant might own or possess * * *," Husband cashed in an IRA to pay the arrears. (Oct. 1, 2009 Tr. 226.) Finally, Husband admitted that he had been on vacation and spent "some money" despite having not paid child support. (Oct. 1, 2009 Tr. 235-236.)

{¶ 25} Lastly R.C. 3109.04(F)(2)(e) instructs the trial court to consider, "[t]he recommendation of the guardian ad litem of the child * * *." P.S.'s guardian ad litem filed his report in this case on September 24, 2009. The report contains a number of relevant observations. The report indicates that Husband is sometimes capable of reaching agreement with Wife on matters

affecting P.S., however, at other times Husband "gets angry and does not allow for productive discussions or interactions between he and [Wife]." G.A.L. Report p.3. "[Husband] clearly needs to place communication regarding [P.S.] above his negative communication with [Wife]. Communicating by using swear words, derogatory remarks and, raised voices to me states that a party cannot stay focused on the responsibility to place [P.S.'s] well-being first." G.A.L. Report p.3-4. The Guardian opined that, "the issues with [P.S.] could have been resolved years ago but from time to time [Husband's] explosive anger has caused more problems than it has solved." G.A.L. Report p.4. The Guardian asserted that, "shared parenting with joint responsibility will not work if [Husband] continues to be frenetic and uncooperative and zealous and adversarial and on the edge of being out of control." G.A.L. Report p.4.

{¶ 26} The guardian ad litem's report concluded by recommending a "shared parenting plan" but under the Guardian's plan Wife would be named residential parent and residential parent for school purposes. At trial, the guardian ad litem again reiterated that Wife should be named residential parent and legal custodian of P.S. The guardian ad litem stated that while he termed his plan "shared parenting" in his report, it really is not typical shared parenting, rather that terminology was just used to save dignity. (Oct. 1,

2009 Tr. 136, 148-150.) As noted by the guardian ad litem in his brief, the trial court adopted many of the specific recommendations in the G.A.L. report in whole or in part.

{¶ 27} Our review of the record indicates that the trial court considered all of the relevant factors listed in R.C. 3109.04(F)(1) and (F)(2) and that there is competent, credible evidence supporting the trial court's conclusion that designating Wife as the residential parent and legal custodian of P.S. is in the child's best interest. We conclude that the court did not act in an unreasonable, arbitrary, or unconscionable manner by finding the presumption in favor of shared parenting, in the traditional sense, was rebutted by the evidence.

{¶ 28} Husband's first assignment of error is overruled.

## II. Division of Marital Property and Separate Property.

{¶ 29} In the interest of continuity, we examine Husband's third and fourth assignments of error out of order. In his third assignment of error, Husband argues that the trial court erred in dividing the parties' marital property. Specifically, Husband argues that the trial court erred in allocating marital assets, finding that Husband engaged in economic misconduct throughout the course of the divorce, and in determining separate property.

De Facto Termination of Marriage Date

**{¶ 30}** As an initial matter Husband argues that the trial court erroneously selected the date of trial as being the date of the termination of marriage because the parties had been permanently separated since August of 2005.

**{¶ 31}** Pursuant to R.C. 3105.171(A)(2)(a), the date of the final hearing is presumed to be the appropriate termination date of the marriage unless the court, in its discretion, uses a de facto termination. *O'Brien v. O'Brien*, Cuyahoga App. No. 89615, 2008-Ohio-1098, at ¶40, citing *Badovick v. Badovick* (1998), 128 Ohio App.3d 18, 713 N.E.2d 1066; *Berish v. Berish* (1982), 69 Ohio St.2d 318, 321, 432 N.E.2d 183.

**{¶ 32}** "In general, trial courts use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, and continually maintain separate residences, separate business activities, and separate bank accounts. However, courts should be reluctant to use a de facto termination of marriage date solely because one spouse vacates the marital home. Rather, a trial court may use a de facto termination of marriage date when the evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances. A court's decision to use the date of the final hearing or a de facto date is discretionary and will not be reversed on appeal absent an abuse of discretion." Id. at ¶41, (internal

citations omitted).

{¶ 33} Here, we do not find that the trial court abused its discretion in failing to find a de facto date of termination of the marriage that was earlier than the final hearing date. Husband directs the Court to his memorandum regarding de facto termination of marriage that was filed September 29, 2009.

None of the assertions of fact on which he bases his argument are supported by an attached affidavit to this motion. Beyond Husband's motion, significant portions of the parties' marital property and financial holdings remained entangled until trial to the extent that the trial court specifically found that Husband's economic conduct during the divorce, routinely in violation of restraining orders, directly dissipated marital assets. After initially separating, the parties attempted to reconcile throughout 2004 and 2005. Husband continued to pay the mortgage on the marital home where Wife resided with P.S. throughout the divorce and he surreptiously placed a second mortgage on the marital property without notifying Wife. Additionally, during the divorce Husband failed to comply with court ordered support obligations. Finally, the parties shared credit cards beyond August of 2005. For these reasons, we find that the trial court did not err in refusing to find a de facto termination date of the marriage.

<u>Division of Marital Property</u>

{¶ 34} We next address Husband's argument that the trial court erred in its division of the parties' marital property. In a divorce proceeding, a trial court must divide the marital property of the parties equitably. R.C. 3105.171(B); *Cherry v. Cherry* (1981), 66 Ohio St.2d 348, 421 N.E.2d 1293. Marital property includes all real and personal property and interest in real and personal property that is currently owned by either or both of the spouses and that was acquired by either or both of the spouses during the marriage. Separate property includes property acquired prior to the date of marriage, or through inheritance or gift, or acquired with non-marital funds after separation.

{¶ 35} We review a trial court's division of property under an abuse of discretion standard. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597. In doing so, we consider whether the property division, as a whole, was an abuse of discretion. See *Briganti v. Briganti* (1984), 9 Ohio St.3d 220, 222, 459 N.E.2d 896. An abuse of discretion connotes more than an error in judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. Accordingly, if there is some competent, credible evidence in the record to support the trial court's decision, there is no abuse of discretion. *Kapadia v. Kapadia*, Cuyahoga App. No. 94456, 2011-Ohio-2255,

citing *Wilburn v. Wilburn*, Lorain App. No. 05CA008740, 2006-Ohio-2553.

{¶ 36} R.C. 3105.171, which governs property distribution, expresses no specific way for the trial court to determine property valuation. *Crim v. Crim*, Tuscarawas App. No. 2007 AP 06 0032, 2008-Ohio-5367; *Focke v. Focke* (1992), 83 Ohio App.3d 552, 615 N.E.2d 327. An appellate court's duty is not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value. *Focke*; *James v. James* (1995), 101 Ohio App.3d 668, 656 N.E.2d 399. A trial court must have a rational, evidentiary basis for assigning value to marital property. *McCoy v. McCoy* (1993), 91 Ohio App.3d 570, 632 N.E.2d 1358.

{¶ 37} R.C. 3105.171(C)(1) mandates an equal division of marital property, or if an equal division is inequitable, the court must divide the marital property equitably. See *Neville v. Neville*, 99 Ohio St.3d 275, 277, 2003-Ohio-3624, 791 N.E.2d 434. To determine what is equitable, a trial court must consider the factors set forth in R.C. 3105.171(F). Id.

{¶ 38} R.C. 3105.171(E)(1) allows for a trial court to make a distributive award to "facilitate, effectuate, or supplement a division of marital property." R.C. 3105.171(E)(4) sets forth a court's authority to issue a distributive award as follows: "If a spouse has engaged in financial misconduct, including, but not

limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."

{¶ 39} "The distributive award concept is consistent with the well-established principle that trial courts have broad discretion when creating an equitable division of property in a divorce proceeding." *Adams v. Chambers* (1992), 82 Ohio App.3d 462, 612 N.E.2d 746, citing *Teeter v. Teeter* (1985), 18 Ohio St.3d 76, 479 N.E.2d 890.

{¶ 40} In the case sub judice, Husband argues that the trial court erred in finding that he engaged in economic misconduct and in its division of marital property. Contrary to Husband's arguments, a review of the transcript supports the trial court's conclusions that Husband's testimony was evasive, internally inconsistent, contradictory, and lacking in credibility. Husband's own admissions at trial support the court's finding that Husband:

> "Repeatedly violated Court restraining orders by encumbering and pledging assets during the course of the divorce proceedings. During the divorce proceedings, increased debt was incurred and net assets were diminished as a result of [Husband's] dealings in violation of the restrictions of the restraining orders." (See for example, Feb. 9, 2010 Tr. 65, 76-77, 81-82, 112, 144, 147, 186, 204; Feb. 10, 2010 Tr. 305-306,

371, 484.)

{¶ 41} Husband testified that after the court order restrained him from encumbering assets he incurred $13 million dollars in debt. (Feb. 10, 2010 Tr. 484.) Husband stated that he may have borrowed as much as $16 million dollars during the divorce but justified this by stating, "* * * it's down to $9.9 million, so I've done pretty well in [these] economic times, paid off seven million in loans through developments." (Feb. 10, 2010 Tr. 484-485.) Husband admitted that at no point did he petition the court for relief from the restraining order to incur such debts, nor did he consult Wife regarding the debts during the divorce. (Feb. 9, 2010 Tr. 118; Feb. 10, 2010 Tr. 487.) Husband admitted that he is a "gambling kind of risk taker" in his real estate investments and he claims that he is presently broke due to poor investments. (Feb. 10, 2010 Tr. 665-668.)

{¶ 42} In attempting to value the marital property in this case, the trial court expressed its frustration that "[w]hile it would be desirable to divide the parties' property in terms of an accounting like balance sheet, in this case that is simply not possible." The court found that this was due in large part to Husband's obstructing of discovery. The testimony of the court appointed receiver supported this conclusion. (Feb. 10, 2010 Tr. 402, 411, 443, 447, 452.) Husband himself acknowledged non-disclosure of certain financial

information. (Feb. 9, 2010 Tr. 147, 153; Feb. 11, 2010 Tr. 738.) Husband claimed that his tax return for 2008 was still not completed at the time of trial in February of 2010 because he owed his accountant money. (Feb. 9, 2010 Tr. 130.)

{¶ 43} Husband repeatedly denied receiving hundreds of thousands of dollars in distributions from his real estate ventures throughout the course of the divorce despite documentary evidence that reflected such distributions. (Feb. 9, 2010 Tr. 98; Feb. 10, 2010 Tr. 275, 280-282, 293, 294-296, 301.) Husband repeatedly testified that he was unable to recall or did not know what happened to distributions he did receive. (Feb. 9, 2010 Tr. 69-70, 72, 82-83.)

{¶ 44} Despite Husband's position that he was completely broke, Husband admitted to completing a financial affidavit on September 22, 2008 for the purpose of borrowing money from Huntington National Bank. (Feb. 10, 2010 Tr. 371-383.) Husband's financial disclosures to Huntington revealed that he claimed total assets of $3,933,000 and a net worth of $2,374,000. (Feb. 10, 2010 Tr. 379.) Husband testified that he was telling the truth when he completed this financial affidavit. (Feb. 10, 2010 Tr. 374.) The trial court put significant weight upon this documentation in determining the overall value of the parties' marital property.

{¶ 45} It is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses. *Pruitt v. Pruitt*, Cuyahoga App. No. 84335, 2005-Ohio-4424, at ¶32, citing *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178. Based on the testimony and related documentation discussed above, the trial court found that Husband had engaged in economic misconduct in violation of R.C. 3105.171(E)(4) and stated that it would "fashion a distributive award consisting of property and a lump sum monetary award for dissipated assets, as well as a significant sum towards [Wife's] attorney fees and costs."

{¶ 46} The trial court awarded wife $500,000 as her share of the marital property together, along with the contents of the former marital home. The trial court additionally awarded Wife $100,000 worth of marital property stemming from her retirement and pension plans, rollover accounts at FSC, checking and savings account at Fifth Third Bank, a brokerage account, and a motor vehicle. The trial court noted that the $600,000 total award of marital property was less than a 50 percent division of Husband's purported net worth of $2,374,000, however, in consideration of the factors in R.C. 3105.171(F), the court noted that the marriage was not one of great length and that husband was "engaged in real estate transactions during a rapidly degenerating real estate market and total reliance on a statement prepared for loan purposes is

somewhat suspect."

{¶ 47} Based on the foregoing we find that the trial court's finding that Husband committed financial misconduct did not constitute an abuse of discretion. The record strongly supports the trial court's conclusion that Husband ignored court orders and engaged in risky real estate ventures, conducting business as usual to the detriment of marital assets. Furthermore, the record reveals that the trial court considered the factors in R.C. 3105.171(F) in determining an equitable division of marital property and the court's decision is supported by competent, credible evidence in the record. We find that the trial court did not abuse its discretion in dividing marital property.

Separate Property

{¶ 48} Husband argues that the trial court erred in determining the separate property of both Husband and Wife. The determination of whether property is marital or separate is a mixed question of law and fact and will not be reversed unless it is against the manifest weight of the evidence. *Torres v. Torres*, Cuyahoga App. Nos. 88582 and 88660, 2007-Ohio-4443, at ¶14. Once the characterization is made, the actual distribution of the property will not be disturbed absent an abuse of discretion. *Larkey v. Larkey* (Nov. 4, 1999), Cuyahoga App. No. 74765, citing *Cherry v. Cherry* (1981), 66 Ohio St.2d 348,

355, 421 N.E.2d 1293.

{¶ 49} Property acquired during a marriage is presumed to be marital property. *Williams v. Williams*, Cuyahoga App. No. 95346, 2011-Ohio-939. "The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." Id., quoting *Peck v. Peck* (1994), 96 Ohio App.3d 731, 734, 645 N.E.2d 1300. See, also, R.C. 3105.171.

{¶ 50} Marital property is defined as "[a]ll real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). Marital property also includes " * * * all income and appreciation of separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(iii).

{¶ 51} By contrast, separate property includes any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage. R.C. 3105.171(A)(6)(a)(ii). Separate property also includes inheritances by one spouse by bequest, devise, or descent during the course of the marriage. R.C. 3105.171(A)(6)(a)(i). Such property remains separate property, even when it is commingled with other

property, unless it is not traceable. R.C. 3105.171(A)(6)(b). However, if commingled marital funds were used to pay the expenses of separate real estate, the real estate is properly considered marital property subject to equitable division. *Robinette v. Robinette*, Cuyahoga App. No. 88445, 2007-Ohio-2516 at ¶23. "The Party attempting to prove that the asset is traceable separate property must establish such tracing by a preponderance of the evidence." Id., citing *Price v. Price*, 11th Dist. No. 2000-G-2320, 2002-Ohio-299. It is that party's burden to trace the funds used to pay for the real estate and establish, by a preponderance of the evidence, that his separate property was not commingled with marital proeprty. Id. at ¶25, citing *Osborn v. Osborn*, Trumbull App. No. 2003-T-0111, 2004-Ohio-6476.

{¶ 52} We note initially that the trial court left the marital home and Husband's Shaker Heights condominiums that Husband purchased prior to the marriage to Husband. However, as part of the distributive award addressed above, the trial court ordered Husband to immediately place the properties up for sale and apply the proceeds to Wife's $500,000 monetary award or, if Husband preferred not to sell the properties, the court ordered Husband to pay Wife an initial $70,000 of the monetary award within 60 days. We find no error in the trial court's distributive award in light of the fact that at trial Husband submitted no documentation demonstrating that non-marital

funds were used for the mortgage, upkeep, and renovations of these properties during the course of the marriage and divorce proceedings. (Feb. 11, 2010 Tr. 719, 754.)

**{¶ 53}** Additionally Husband was awarded his Willoughby, Ohio residence, including its contents, all motor vehicles titled in his name, and all his other real estate, partnership, corporate, and trust holdings.

**{¶ 54}** Husband argues that the trial court should have awarded him non-marital property credit in the amount of $638,838.78 based on money that he had inherited from his mother's estate in 2002. Husband testified that he placed this money in several UBS Paine Webber accounts in 2002. Husband presented documentation of the UBS accounts including an April 2007 "summary of asset allocation" that reflected $682,416.22 in total account values. Husband claimed that he used the money in his UBS accounts to purchase shares of stock in various real estate ventures that later resulted in distributions back to him. (Feb. 11, 2010 Tr. 645.)

**{¶ 55}** However, Husband testified that the UBS accounts had been "wiped out" at the time of trial. He admitted that the money was lost on poor real estate investments. (Feb. 10, 2010 Tr. 607.) Husband further testified that during the course of the marriage and divorce, he never kept track of any funds going out of or back into the UBS accounts despite the fact that all the

money that he had made during the course of the marriage he invested in real estate. (Feb. 11, 2010 Tr. 721-722.) Husband further testified that it was impossible for him to track what money went in and out of his real estate dealings. (Feb. 11, 2010 Tr. 723.)

{¶ 56} Without documentation of money coming in and out of real estate deals the trial court was free to disbelieve Husband's self-serving testimony. *Deacon v. Deacon*, Cuyahoga App. No. 91609, 2009-Ohio-2491, at ¶43, citing *Tokar v. Tokar*, 8th Dist. No. 89522, 2008-Ohio-6467 (trial court properly rejected Husband's testimony regarding negative value of marital property because he failed to submit independent evidence); *Smith v. Smith*, 12th Dist. No. CA2001-11-259, 2002-Ohio-5449 (trial court did not abuse its discretion in rejecting Husband's claim that he used money withdrawn from savings plan on marital household expenses when Husband failed to substantiate his self-serving testimony).

{¶ 57} Based on the above testimony, the trial court did not abuse its discretion when it found that Husband's efforts to trace the inherited funds through the UBS accounts and into his various real estate ventures failed to establish, by a preponderance of the evidence, that his separate property was not commingled with marital property.

{¶ 58} Finally, Husband argues that the trial court erred in finding

separate property in favor of Wife in the amount of $80,000. At trial Wife testified that she had a brokerage account with Dean Witter containing $9,000, which she had accumulated prior to the marriage, along with FSC Rollover Accounts from jobs prior to marriage in the amounts of $10,000 and $50,000. (Feb. 10, 2010 Tr. 554-555.) Husband did not challenge these assertions. Wife further testified that she had a 401K from Parma General Hospital. Wife's testimony was that she did not know exactly how much money was in the 401K prior to marriage. She estimated $20,000. (Feb. 10, 2010 Tr. 555.) Wife's exhibit 136 indicates a balance in the 401K of $102,128.57 as of December 31, 2009. Wife's exhibit 160 reflects that the 401K's balance was $17,833.17 as of March 31, 2001, the date of marriage. Husband's argument that wife provided "absolutely zero evidence of any separate property" is refuted by the record and without merit.

{¶ 59} Husband's third assignment of error is overruled.

<u>P.S.'s 529 College Account</u>

{¶ 60} Husband's fourth assignment of error also pertains to separate property. Husband argues that the trial court erred by ordering him to replace $55,688 in a 529 College Savings Account for P.S. At trial Husband testified that he liquidated P.S.'s 529 trust during the course of the divorce, despite the restraining order, in order to repay a loan to Dollar Bank for one of

his real estate companies. (Feb. 9, 2010 Tr. 144.) Husband claimed that the money that originally funded the 529 account came from the money that he had inherited from his mother. (Feb. 11, 2010 Tr. 658.) Husband presently argues that despite the restraining order, he had the right to unilaterally remove the funds because he felt they constituted his separate property. As discussed above, the trial court specifically found that Husband failed to properly trace his inherited funds with documentary evidence and found Husband's self-serving testimony to be lacking credibility.

{¶ 61} Husband's fourth assignment of error is overruled.

## III. Attorney Fees, Guardian Ad Litem Fees, Receiver Fees and Court
   Costs.

{¶ 62} Lastly, we address Husband's second assignment of error that asserts that the trial court abused its discretion by ordering Husband to pay a portion of Wife's attorney fees as a lump sum spousal award, fees for the receiver, the receiver's attorney fees, the outstanding balance owed to the guardian ad litem and court costs.

{¶ 63} A key factor in the trial court's decision to hold Husband responsible for each of the above fees and costs was an email from Husband to Wife wherein Husband stated, "Lets have a global settlement with [P.S.] now or I will keep you in Court for the next 12 years, not a threat just a reality * *

*” (Plaintiff's Exhibit 63; Feb. 10, 2010 Tr. 532-533.) In regard to assigning the above fees and costs the trial court explained it's rationale as follows:

> "* * * the Court credits [Husband's] e-mail to [Wife] where he threatened to keep her in Court for twelve years. That e-mail served as a blunt assessment of the legal strategy he employed to impede, obstruct, and hinder the progress of this case, creating along the way exorbitant costs in litigation. Since [Husband] chose this route, he must bare the expense of this nonsense."

### Wife's Attorney Fees

**{¶ 64}** In regard to Wife's attorney fees, the trial court ordered Husband to pay $200,000 of Wife's outstanding attorney fee balance of $230,000. The trial court fashioned Wife's attorney fee award in the form of a lump sum spousal award pursuant to R.C. 3105.73(D).

**{¶ 65}** The decision to award attorney fees rests in the sound discretion of the court and will not be overturned on appeal absent an abuse of that discretion. *O'Brien v. O'Brien*, Cuyahoga App. No. 89615, 2008-Ohio-1098, at ¶77, citing *Layne v. Layne* (1992), 83 Ohio App.3d 559, 568, 615 N.E.2d 332. R.C. 3105.73 sets forth the trial court's authority to award attorney fees in a divorce proceeding and provides in relevant part:

"(A) In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate."

**{¶ 66}** Beyond Husband's candid email, extensive testimony was heard at trial regarding Husband's lack of cooperation in discovery and custody matters. (See for example, Feb. 9, 2010 Tr. 113; Feb. 10, 2010 Tr. 402-403, 411, 443, 452, 457, 528-529.) The record reflects that Husband routinely ignored court orders relating to both spousal and child support and the transference and encumbrance of marital assets that resulted in additional litigation. (See Feb. 9, 2010 Tr. 65, 76-77, 81-82, 112, 117-119, 139-142, 147, 153, 178, 204; Feb. 10, 2010 Tr. 390-391, 484.) The lengthy docket in this case reveals the extensive litigation and court filings that the trial court attributed, at least in part, to Husband's conduct.

**{¶ 67}** In further support of the trial court's decision to award Wife a portion of her attorney fees, the trial court found that Husband engaged in economic misconduct under R.C. 3105.171(E)(4) resulting in the dissipation of

marital assets.   Husband ignored the trial court's restraining order and unilaterally gambled marital property on real estate ventures during the course of the divorce proceedings.   As discussed above, the record supports the trial court's conclusion that Husband engaged in economic misconduct.

**{¶ 68}** Finally, the trial court stated that it considered the factors in R.C. 3105.18 in determining that Wife's attorney fees award should be treated as a lump sum spousal support award in lieu of any periodic spousal support.   An award of spousal support will be reversed on appeal only if an abuse of discretion is shown.   *Maloof-Wolf v. Wolf* , Cuyahoga App. No. 94114, 2011-Ohio-701, at ¶53 citing *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 24, 550 N.E.2d 178.   R.C. 3105.18(C)(1) outlines the factors that the trial court must consider when determining whether to order an award of spousal support.   R.C. 3105.18(C)(1) provides:

"In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

"(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

"(b) The relative earning abilities of the parties;

"(c) The ages and the physical, mental, and emotional conditions of the parties;

"(d) The retirement benefits of the parties;

"(e) The duration of the marriage;

"(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

"(g) The standard of living of the parties established during the marriage;

"(h) The relative extent of education of the parties;

"(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

"(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

"(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided

the education, training, or job experience, and employment is, in fact, sought;

"(l) The tax consequences, for each party, of an award of spousal support;

"(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

"(n) Any other factor that the court expressly finds to be relevant and equitable."

**{¶ 69}** A trial court is not required to enumerate each factor in R.C. 3105.18(C)(1), but must merely provide a sufficient basis to support its award. *Kapadia v. Kapadia*, Cuyahoga App. No. 94456, 2011-Ohio-2255; citing *Abram v. Abram*, Medina App. No. 3233-M, 2002-Ohio-78.

**{¶ 70}** We find no error in the court's analysis or conclusion on this issue. Just as R.C. 3105.73 requires, the court considered whether an award of fees to the parties would be equitable. The court additionally considered the factors in R.C. 3105.18 in determining appropriateness of awarding Wife her attorney fees in the form of spousal support. R.C. 3105.73(D) specifically authorizes a court to designate an attorney fee award as spousal support. Accordingly, based on the record, we find that the award of attorney fees was neither unreasonable, arbitrary, nor unconscionable and affirm the trial court's decision.

## Receiver Fees and Receiver Attorney Fees

{¶ 71} Husband argues that the trial court erred in ordering him to pay the receiver's outstanding fees and the receiver's legal fees. As an initial note, the trial court's judgment entry denied compensation to Wife for a claimed non-marital account seized by the receiver during the divorce. From this account, $18,800 was applied to the receiver's fees, $7,200 was applied to the receiver's attorney fees, and $2,500 was applied to the guardian ad litem's bill. The court denied Wife's request for the return of these amounts and treated them as Wife's contribution to the litigation costs of having a receiver and a guardian ad litem. The court ordered Husband to pay the outstanding balance of the receiver's fees, $42,157, and the receiver's outstanding attorney fees, $53,453.

{¶ 72} Husband cites absolutely no legal authority in support of his argument that the trial court erred in assigning the remainder of these fees to him. An appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A)(7). *State v. Martin* (July 12, 1999), Warren App. No. CA99-01-003, citing *Meerhoff v. Huntington Mtge. Co.* (1995), 103 Ohio App.3d 164, 658 N.E.2d 1109; *Siemientkowski v. State Farm Ins.*, Cuyahoga App. No. 85323, 2005-Ohio-4295. "If an argument exists that can

support this assigned error, it is not this court's duty to root it out." *Cardone v. Cardone* (May 6, 1998), Summit App. Nos. 18349 and 18673.

{¶ 73} Instead of presenting a legal argument that the court erred in the assignment of these fees, Husband argues that the Receiver essentially provided no service of value to the divorce. Husband's argument however is not supported by the record. The Receiver testified in regard to his efforts at trial that included uncovering assets, managing funds, and countless hours spent mediating the case with both parties. (Feb. 10, 2010 Tr. 447, 401, 416.) Additionally, the Receiver incurred legal fees generated by a number of appeals that were initiated by Husband, many of which were dismissed as non-final appealable orders. See, e.g., *Strauss v. Strauss*, Cuyahoga App. No. 92615, 2009-Ohio-5493; *State, ex rel. Marc I. Strauss v. Celebrezze*, Cuyahoga App. No. 92369, 2009-Ohio-370.

{¶ 74} Receivers are entitled to compensation "as is reasonable in view of the interest involved, the amount of skill necessary to conduct the business, and the time and labor given to the business." *Nozik v. Mentor Lagoons, Inc.* (July 2, 1998), Lake App. No. 97-L-004, citing *Postle v. Wolfram Guitar Co.* (C.P.1902), 13 Ohio Dec. 228, 229. Fixing this measure of compensation is left to the sound discretion of the trial court. Id., citing *Nowman v. Nowman* (May 12,1930), Butler App. No. 454, 8 Ohio Law Abs. 429. Husband's

argument as to this issue is without merit and further unsupported by legal authority and is therefore disregarded.

### Guardian Ad Litem Fees

{¶ 75} Husband argues that the trial court erred in ordering him to pay "any outstanding balance owed the [guardian ad litem]" in the judgment entry of divorce.

{¶ 76} A trial court's appointment of a guardian ad litem and award of fees must be upheld absent an abuse of discretion. *Swanson v. Schoonover*, Cuyahoga App. Nos. 95213, 95517, 95570, 2011-Ohio-2264, citing *Gabriel v. Gabriel*, 6th Dist. No. L-08-1303, 2009-Ohio-1814, ¶15. A trial court is given considerable discretion in these matters. Id.

{¶ 77} The record reflects that Wife provided contributions to the guardian ad litem's fees during the pendency of the divorce. Furthermore, as discussed above, the testimony of the guardian ad litem revealed that throughout the divorce, Husband's hostile behavior towards Wife in regard to P.S. frequently necessitated intervention by the guardian ad litem. This court has previously recognized that it may be proper to allocate the guardian ad litem's fees based on which party caused the work of the guardian ad litem. *Jarvis v. Witter*, Cuyahoga App. No. 84128, 2004-Ohio-6628, at ¶100, overruled on other grounds, *Siebert v. Tavarez*, Cuyahoga App. No. 88310,

2007-Ohio-2643.

{¶ **78**} Under these circumstances, there is nothing to indicate that the trial court's decision to allocate the guardian ad litem's fees to Husband was unreasonable, arbitrary, or unconscionable. Therefore, we find no abuse of discretion.

### Court Costs

{¶ **79**} Finally, Husband argues that the trial court erred in ordering him to pay court costs. We review a trial court's ruling on court costs for an abuse of discretion. *D'Hue v. D'Hue*, Cuyahoga App. No. 81017, 2002-Ohio-5857, at ¶120. Civ.R. 54(D) provides that, "[e]xcept when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."

{¶ **80**} Husband argues that the court abused its discretion by ordering him to pay costs where there was no "prevailing party" and he testified to having no source of income while Wife has "an ability to earn a substantial income." To begin, we have previously rejected the argument that a trial court is precluded from assigning court costs to one party in a divorce where neither party technically "prevails." Id. Furthermore, the trial court found Husband's testimony regarding his lack of income to be lacking in credibility. Based on the foregoing we cannot conclude that the trial court abused its

discretion in awarding costs against Husband.

**{¶ 81}** Husband's second assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said lower court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, JUDGE

PATRICIA A. BLACKMON, P.J., and
MELODY J. STEWART, J., CONCUR

Appendix

*Assignment of Error No. 1*:

> "The trial court erred and abused its discretion in its allocation of parental rights and responsibilities by awarding Plaintiff-appellee the status of primary residential parent and legal custodian of the parties' minor child and by denying Defendant-appellant's motion for shared parenting."

*Assignment of Error No. 2*:

"The trial court abused its discretion and erred by ordering Defendant-appellant to pay Plaintiff-appellee the sum of $200,000 for attorney fees, $42,157 in receiver fees, and $53,453 in receiver's attorney fees. Additionally, the court abused its discretion and erred by ordering Defendant-appellant to pay any outstanding balance owed the Guardian Ad Litem. The court also erred and abused its discretion by ordering Defendant-appellant to pay the costs of the proceedings. The factual conclusions upon which the trial court based the exercise of its discretion were against the manifest weight of the evidence and was an abuse of discretion."

*Assignment of Error No. 3*:

"The trial court erred and abused its discretion when it found economic misconduct, found that Defendant-appellant failed to prove separate property, and by awarding Plaintiff-Appellee all of Defendant-appellant's separate property as a distributive award."

*Assignment of Error No. 4*:

"The trial court abused its discretion by ordering Husband to replace the 529 college account."