[Cite as *In re A.N.*, 2026-Ohio-1646.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE A.N.                                    :

Minor Child                                   :                    Nos. 115219 and 115302

[Appeal by L.R., Mother]                      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 7, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. FA19106403

---

### *Appearances:*

Stacey Kubyn, *for appellant.*

Gembala, McLaughlin & Pecora, Co., LPA, Anthony R. Pecora, Anabelle R. Alamir and Rachel E. Reinbolt, *for appellee.*

EILEEN A. GALLAGHER, J.:

{¶ 1} L.R. ("Mother") appeals the juvenile court's journal entry modifying the agreed shared parenting plan (the "Parenting Plan") that awarded R.M. ("Father") exclusive control of the parties' minor child's ("A.N.") passport and lessened the conditions under which Father was permitted to travel with A.N.

outside of the United States.  For the following reasons, we affirm the judgment of the juvenile court.

## I.    Facts and Procedural History

{¶ 2} On May 17, 2019, Father filed an application to establish parental rights and responsibilities regarding A.N., who was born in 2015.  On May 6, 2021, the court adopted Mother's and Father's agreed judgment entry, which included the Parenting Plan.  We note that evidence in the record demonstrates that Father was born in the United Arab Emirates and much of his family resides in India.  Part of the Parenting Plan contemplated international travel with A.N.

{¶ 3} Specifically, the Parenting Plan stated as follows regarding "Removing [A.N.] from the Continental United States":

> Neither party shall remove [A.N.] from the continental United States without the express written consent of the other parent due to international sensitivity. [A.N.] shall not be removed from the continental United States by Father until [A.N.] is at least ten (10) years of age and Father has obtained his Green Card which Green Card documentation has been presented to Mother before international travel commences.

> [A.N.] shall be permitted to travel outside the Continental United States in the even[t] of a family emergency that requires her travel or in the event Father gets married outside the Continental United States. If the child is under the age of ten (10) years old, she shall be accompanied by her Mother or an escort to be selected by the Mother, at Mother's expense.

> [A.N.] shall not be away from her home in the United States for more than three (3) weeks without written permission for an extended period from Mother.

> Full itinerary and return ticket must be presented to Mother no less than forty-five (45) days prior to travel.

Mother shall be entitled to daily communication with [A.N.] and international host via phone, Skype, Zoom or other then existing communication program.

Except when [A.N.] is traveling, Mother shall retain possession of the child's passport and shall be responsible for renewals of the passport when necessary.

{¶ 4} On April 15, 2023, Father notified Mother that he was going to be married in India and he planned to travel with A.N. to India from approximately June 27, 2023 to July 28, 2023 for the wedding festivities. Mother refused to abide by the conditions imposed in the Parenting Plan regarding A.N.'s passport and A.N. traveling to India to attend Father's wedding.

{¶ 5} On June 9, 2023, Father filed a motion to modify the Parenting Plan and a motion for temporary orders pursuant to Juv.R. 13, in an effort to have A.N. attend his wedding. The court issued a journal entry on June 13, 2023, finding that the parties contemplated A.N. attending Father's wedding in India in the Parenting Plan and ordering Mother and Father "to follow this agreement as much as possible, keeping in mind what is in the best interest of" A.N.

{¶ 6} The court issued another journal entry on June 22, 2023, again ordering the parties to abide by the Parenting Plan and particularly noting that Mother failed to respond to Father's motion to follow the court order. This journal entry also stated that failure to comply with the court order may result in the violating party being held in contempt of court.

{¶ 7} Although Father made repeated requests of Mother seeking that she renew A.N.'s passport, Mother failed to do so. A.N., therefore, was unable to travel with Father to India to attend his wedding.

{¶ 8} On August 1, 2023, the court appointed a guardian ad litem ("GAL") for A.N.

{¶ 9} On December 28, 2023, Father filed another motion to modify the Parenting Plan, which focused on altering the conditions imposed on A.N.'s international travel and permitting Father to have control of A.N.'s passport. On March 1, 2024, Mother filed a motion to terminate shared parenting and designate her as the sole residential parent and legal custodian of A.N. A mediation took place on December 6, 2024 but no agreement between the parties was reached.

{¶ 10} A hearing was held on March 25, 2025 before a magistrate. On April 6, 2025 the magistrate issued a decision modifying the Parenting Plan as it concerned A.N.'s passport and international travel conditions. The magistrate found that "the terms of [the Parenting Plan] clearly anticipate instances when [A.N.] would leave the United States, prior to reaching the age of 10-years old; and, would specifically travel to India. Mother chose to strictly and selectively follow parts of the agreement, to the detriment of [A.N.]."

{¶ 11} The magistrate found that modification of the Parenting Plan was necessary and in the best interest of A.N. The court granted Father's motion to modify and Mother withdrew her motion to terminate shared parenting. Father was ordered to be responsible for A.N.'s passport. The court ordered that Father is

permitted to travel with A.N. internationally, and specifically to India, upon providing Mother with the travel itinerary at least 30 days prior to departure. International travel may be up to four weeks and shall occur during A.N.'s summer school break. The same conditions apply to Mother taking A.N. on an international trip. Exceptions were put in place for weddings or the birth of a child in India.

{¶ 12} On April 21, 2025, Mother filed objections to the magistrate's decision. On April 22, 2025, the court issued a journal entry making the same findings and orders as found in the magistrate's decision. On June 6, 2025, the court issued another journal entry overruling Mother's objections to the magistrate's decision and reiterating its prior findings and orders.

{¶ 13} On July 3, 2025, Mother filed a notice of appeal from the court's June 6, 2025 journal entry, raising the following assignments of error for our review:

> I. The juvenile court abused its discretion by granting Father exclusive control of the child's passport and broad rights to take her to India, without a meaningful best-interest analysis or safeguards in light of Father's substantial India-based ties and his ability to live and work there.
>
> II. The court improperly rewrote the parties' 2021 shared parenting plan's international-travel framework — age limits, consent, and duration — without the specific best-interest findings required by Ohio Rev. Code Ann. § 3109.04(E)(2)(b) and contrary to *Kenney v. Carroll*.
>
> III. The court's cursory treatment of Mother's evidentiary objections and its reliance on Father's exhibits to resolve flight-risk and intent, while ignoring undisputed evidence of his new Indian marriage, remote work, and Mother's non-Hague concerns, render the judgment against the manifest weight of the evidence.

## II.  Hearing Testimony

{¶ 14} A hearing was held before the magistrate on March 25, 2025, on Father's motion to modify the Parenting Plan.  At the onset of the hearing, Mother's counsel objected to any exhibits Father intended to introduce in the proceedings, arguing that Father failed to submit an exhibit list 14 days prior to the hearing.  In response, Father's counsel stated on the record that "the exhibit list has been filed before the last trial.  It's the same exhibits."  It is unclear from the transcript when the "exhibit list" was filed or when the "last trial" was held.  Nonetheless, the court allowed the admission into evidence of "whatever exhibits . . . counsel intends to present today . . . ."

{¶ 15} At this hearing, Mother and Father testified about the only two contested issues, which were "international travel for [A.N.] and passport renewal."

### A. Mother

{¶ 16} Mother first testified as if under cross-examination in Father's case-in-chief.

{¶ 17} Mother acknowledged the conditions in the Parenting Plan under which A.N. could travel internationally with either parent, the conditions under which A.N. could travel with Father, specifically to India, for his wedding and the conditions under which A.N.'s passport was to be maintained.

{¶ 18} Mother testified that A.N.'s passport expired in 2022.  Mother further testified that, on April 15, 2023, Father informed her that he intended to travel to

India with A.N. from late June to late July 2023, for his wedding. According to the Parenting Plan, it was Mother's responsibility to renew A.N.'s passport.

{¶ 19} Text messages between Father and Mother from spring 2023 show that Father reminded Mother that she needed to start the renewal process for A.N.'s passport. Father also clarified that his plan was to depart for India with A.N. on June 27, 2023. Mother testified that she "started looking into the process on receiving this information." Mother further explained that this meant she referred Father's request to her lawyer. Asked if A.N.'s passport was ever renewed, Mother responded, "He did not sign the necessary paperwork to have it renewed." The court clarified as follows: "I think the answer would have been no, it's not been renewed."

{¶ 20} Mother testified that Father sent her an email on May 16, 2023, asking about updates on A.N.'s passport renewal. Asked if she had started the renewal process, Mother responded, "I would need the father's signature, so if I did not have that, I could not start it." The court instructed Mother to answer the question, and Mother answered, "No." When pressed about this by Father's attorney, Mother testified that she did not want Father to "attend" the passport renewal. Rather, she wanted him to sign a "form DS-3053," which states that Father is unable to attend the passport renewal. According to Father's attorney, Father was able to attend the renewal and was uncomfortable signing a government form that stated otherwise. Asked to comment on this, Mother gave a string of nonresponsive answers, such as: "By his own recommendations, he does not like to meet both in person, so I didn't feel it was necessary"; "It's a great way to allow the passport

renewal if he's not present"; and "I think I made myself clear that he doesn't like to be in the same area, only for this circumstance."

{¶ 21} Mother next testified about a May 16, 2023 email she sent to Father, which stated as follows: "Please provide third-party verification that there will be a wedding." Asked if this was required in the Parenting Plan, Mother answered, "It does not require it . . . . I was asking for verification that this is actually a wedding, because it only stipulates travel if there is actually a wedding."

{¶ 22} Mother testified that she consulted a lawyer regarding whether it was necessary for her to accompany A.N. on the trip to India, despite language in the Parenting Plan to which she had previously agreed, clearly stating that A.N. "shall be accompanied" by Mother, or an escort at Mother's expense, in the event Father gets married internationally. Mother further testified about emails from May 19, 2023 in which Father suggests that his mother or other family members could email Mother to verify that Father is getting married on July 9, 2023. Mother responded to Father's email by stating that verification needed to be provided by a third party, not a family member. Father suggested that his friend, whom Mother met when she had previously traveled to India with Father and A.N., could confirm Father's wedding plans. Mother responded as follows: "Well, I need a third-party, so not directly affiliated with you, to confirm, as well."

{¶ 23} Mother testified that, on May 26, 2023, Father sent her a notarized statement from an attorney in India verifying that his wedding was to take place as noted. Mother testified that she "rejected" A.N. traveling to India for Father's

wedding because, in part, the Parenting Plan does not require verification that Father is actually getting married.

{¶ 24} Mother further testified that, according to the Parenting Plan, A.N. could travel to India "for the wedding," which she felt meant A.N. could travel to India for one day. After much questioning from Father's attorney, Mother testified that she never explored flights for her to accompany A.N. on this trip and she never looked into hiring an escort to accompany A.N. on this trip. As an explanation for her inaction, Mother stated that Father did not provide her with an itinerary for the trip and the proposed dates of the trip were longer than the three weeks provided for in the Parenting Plan.

{¶ 25} Mother testified about an email Father sent her on May 27, 2023 in which he stated that the provision of the Parenting Plan requiring Mother or an escort to accompany A.N. on an international trip if A.N. was under ten years old was added at Mother's suggestion. According to Mother, Father stated in the email that the Parenting Plan requires this but, with Mother's consent, he could take A.N. on the trip "without any issues." Mother responded to Father's email stating as follows: "However, this communication and the most recent communication directly shows the intent to break the agreement from the escort agreement to timing, and you've taken actions already to break it, rather than to adhere to it. This does not make me comfortable. I'm inclined to address this with the lawyer and possibly the courts — possibly the courts immediately."

{¶ 26} Father responded to Mother, via email, and stated that he did not "break the agreement." Rather, according to Father, he is permitted to take A.N. to India for his wedding, he notified Mother that he was exercising this option by giving her 60 days' notice, as required under the Parenting Plan, and he was not preventing her from accompanying A.N., or hiring an escort to accompany A.N., on the trip which was a condition that Mother built into the Parenting Plan. Father's email also stated that he was asking for 30 days of travel time, rather than the 21 days listed in the Parenting Plan but it was Mother's option to agree or not agree to the additional requested travel days.

{¶ 27} Mother also testified about her concerns that India is not a signatory of the Hague Convention, children are kidnapped and Father's fiancée "had a son the same age as" A.N., whom Mother does not know. According to Mother, these concerns were in addition to her concerns about the lack of itinerary, the length of the trip and Father "trying to take [A.N.] alone." Father's counsel asked Mother if she had started A.N.'s passport renewal by this time. Mother responded by testifying, "I had gone on the advice of my lawyer at that time." The court again admonished Mother to answer the question asked of her. Mother changed her response to, "Based on the advice of my lawyer, no."

{¶ 28} Mother testified about an email Father sent to her on June 14, 2023 in which he stated that they needed to apply for an expedited passport for A.N. by the next day, June 15, 2023, in order to remain on schedule for the India trip. Father included in the email a link to the expedited passport application process and a "how

to" explanation concerning the required forms. Father reminded Mother that he needed to apply for an Indian visa which he could not do until A.N.'s passport was renewed. Mother did not respond to this email. Father sent Mother emails requesting updates on June 15, 2023, and June 17, 2023. Father also booked an emergency passport appointment for A.N. on June 26, 2023, in Detroit, Michigan. On June 21, 2023, Father emailed Mother that, if she was unable to make this appointment, she could sign the DS-3053 form — the same form that Mother insisted Father sign earlier in this process — allowing Father to handle A.N.'s emergency passport appointment without Mother's presence. On June 22, 2023, Father emailed Mother in which he related that he could shift the travel dates to allow enough time for the passport renewal and visa application.

{¶ 29} On June 22, 2023 Mother responded to Father's emails as follows: "You'll need to speak to your lawyer and my lawyer to get a better understanding of the terms and conditions for travel. I would encourage you to make the proper roots ASAP. Frankly, I'm aghast at how and why you made these plans to wed on such short notice without [A.N.'s] consideration in both meeting and travel."

{¶ 30} Mother testified about a court order dated June 22, 2023 requiring Mother to abide by the Parenting Plan concerning A.N. traveling to India for Father's wedding and A.N.'s passport renewal. This order also states that failure to comply may result in the noncomplying party being held in contempt. Asked if, despite this order, Mother "did nothing still" regarding travel arrangements and passport renewal, Mother answered, "That is not true. I mean, there's clearly several emails

saying that we are negotiating the travel." Asked if she complied with the order, Mother answered, "My understanding is that I had to comply with the complete shared parenting plan, and that was not happening. That is just my understanding." Once again, the court instructed Mother to answer yes or no questions with yes or no answers. Mother responded, "I tried to. I'm saying yes, I had multiple communications with the father and tried to look into renewing the passport, including the forms that we've been discussing. Absolutely."

{¶ 31} Mother testified about another email Father sent to her on June 23, 2023 providing detailed instructions on how to comply with the June 22, 2023 court order, including directions to the emergency passport renewal appointment in Detroit and copies of relevant forms and documents. Asked about Father's email, Mother testified as follows: "He is not responsible for the renewal of the passport, and he made the appointment. So this is part of what he's trying to . . . precipitate."

{¶ 32} Father's counsel asked Mother if she made an appointment to renew A.N.'s passport. Mother gave another nonresponsive answer. The court asked Mother, "Yes or no? Did you make an appointment?" Mother answered, "No."

{¶ 33} Father's counsel asked Mother about a 2017 trip that she, Father, A.N. and Mother's other child took to India. Specifically, Mother was asked if she and her other child left India to go home two days before Father and A.N. left India due to issues with Father's visa. Mother attempted to testify only about Father's visa and not about the two additional days. Asked repeatedly whether or not she left A.N. in India with Father for two days, Mother ultimately answered, "No. That's false,

sir." Father's counsel showed Mother exhibits of each person's plane ticket which reflected that Mother and her other daughter departed India on June 28, 2017 and that Father and A.N. departed India on June 30, 2017. Mother continued to deny that this happened, going as far as stating that the exhibits looked "fabricated."

{¶ 34} Mother testified on direct examination in her case-in-chief.

{¶ 35} When asked if she has ever given written consent for A.N. to be taken out of the continental United States, Mother replied, "No." Asked if she consented now to A.N. being taken out of the continental United States, Mother replied, "No." According to Mother, it was her understanding that she needed to consent to A.N. traveling to India for Father's wedding despite the plain language of the Parenting Plan stating otherwise. Mother testified that, because of her work, finances and the "short notice," she was unable to travel to India with A.N. to Father's wedding in the summer 2023. Mother further testified that her hiring an escort was "a heavy expense that would need to be planned for." Mother was asked if she could afford this, but she did not provide a "yes or no" answer to this question. Asked to explain her concerns further, Mother testified as follows:

> My understanding now is that India is not part of the Hague Convention, which means that India is not required to honor the shared parenting plan. So if he took my child, our child, to India, he would be granted full, you know, legal custody, and that is a huge concern . . . . I don't know that his family would cooperate in her return . . . . I'm generally aware that in India that the rule of law is not enforced the way it is here in the United States. I'm also aware that the statistics are that India is the highest statistic for parental abduction.

{¶ 36} Mother further testified that Father does not own any real estate in the United States and when the parties entered into the Parenting Plan, Father was working at a "brick and mortar office" in Ohio. According to Mother, at the time of the hearing, Father was working "100 percent remotely." Mother testified that Father "absolutely" has "diminished ties to the United States." According to Mother, Father has "zero immediate families here," "very little social connections with people here in the United States" and he "doesn't own anything." Asked if she was concerned that if A.N. went to India, she might not return to the United States, Mother answered, "He's given me reason to believe, yes." Mother further testified that Father "does not recognize that there is a relationship between me and" A.N.

{¶ 37} According to Mother, Father has been asking for more control over A.N. and to have residential custody of A.N., which "alarmed" and "frightened" Mother.

{¶ 38} On recross-examination, Mother confirmed that the only time Father filed something in court about taking A.N. to India was for her to attend his wedding. Father's attorney asked Mother if the filings were made after it became clear to Father that Mother was not going to cooperate with him regarding taking A.N. to India for this trip. Mother answered as follows: "Yeah, there was a change of circumstances. Yes . . . . The change of circumstances was him being married and wanting to be in India."

## B. Father

{¶ 39} Father testified as to his understanding of the Parenting Plan and specifically about him taking A.N. to India, as follows: "If the father is planning on taking [A.N.] to India, his vacation parenting time may be up to three weeks . . . . There is an age limitation. I can only take her to India on certain . . . conditions. If she's — before she turns ten, it has to be that — there has to be a special event, such as a funeral or a wedding . . . . And then I can only take her to India by myself, if she turns ten, I need to have my Green Card." Father further testified that his green card was issued on May 9, 2022 and it is valid for ten years. Prior to this, Father had an H-1B work visa which he was required to renew every three years. According to Father, his ability to stay in the United States was more restrictive in 2021, when the parties entered into the Parenting Plan, than it is now.

{¶ 40} Father further testified that he bought a home in the United States in 2016 and, around the time the parties entered into the Parenting Plan in 2021, he sold the house to Mother. Father testified that, although he works remotely, he is limited on the amount of work he can do outside of the United States because his company deals with confidential patient information. Although the company is "understanding about [his] situation," Father would not be able to perform his job duties on a full-time basis if he lived outside of the United States because of patient privacy issues.

{¶ 41} Father testified that his intention is to become a United States citizen because he wants to see A.N. grow up. Father is in the process of bringing his wife

and stepson, who live in India, to the United States although he understands that this "takes a very long time."

{¶ 42} Father testified about the 2017 trip he, A.N., Mother and Mother's other child took to India. According to Father, Mother and her other child left India at the end of the trip on June 28. Father and A.N. stayed in India for two additional days while he renewed his visa and they departed India on June 30. Father stated that, at the time, there was no concern about him kidnapping A.N., them not returning to the United States or the Hague Convention.

{¶ 43} Father testified that, on April 15, 2023, he emailed Mother about his plan to marry in India and take A.N. with him for the wedding, because he was following the Parenting Plan and this is when the details of the wedding solidified. According to Father, he met with Mother in person shortly after the email to discuss the details. Father testified that Mother did not raise objections to his plans at this meeting. Rather, "she was more curious on how I met someone on short notice . . . [as if] she didn't believe" Father was getting married. According to Father, Mother did not mention child kidnapping, the Hague Convention or anything about A.N.'s safety at this meeting or in any of the emails the parties exchanged regarding this situation. Asked what Mother was focused on, Father testified as follows:

> I mean, she was — In short, I don't think she really ever wanted to send [A.N.] with me in the first place. And this — Initially, towards the middle, it was becoming more and more clear each time I was coming up with and trying to serve her demands or like, Hey, you want verification, here you go, you want to talk to my friend, here you go, giving everything as much as I can, and, you know, ultimately, it was at

the end hour that I came to [my lawyer] to say, we should go ahead and file the motions, because this is clearly not working.

{¶ 44} Father testified that, in the ten years he had lived in the United States at the time of hearing, he had spent approximately six months in India. According to Father, "most" of this travel occurred because he was getting married. Father testified that, although he wants to see his wife, his first priority is "being there for" A.N.

{¶ 45} Father testified that he was seeking a modification of the Parenting Plan because it "clearly did not work well." Father wanted to "retain control of the passport" renewals, and he sought "expanded time for vacation and travel to India," specifically, six weeks of travel to India with A.N., due to the logistics of international travel.

{¶ 46} Father testified that, ultimately, A.N. did not travel to India in the summer of 2023 for his wedding. According to Father, he does not understand, to this day, what aspects of the Parenting Plan Mother was accusing him of "breaking." Father testified that he "did everything in [his] power to follow the agreement to the dot."

{¶ 47} Under cross-examination, Father testified that he tried to work with Mother in getting A.N. to India for his wedding, "[b]ecause it was the most important event in my life and something we agreed to upon which is here in the second paragraph" of the Parenting Plan. Mother's counsel suggested to Father that

there was no need for A.N. to travel to India to "learn about her culture" until she was 18 years old. Father responded to this suggestion as follows:

> I don't know how to answer that question. She is ten years old. She hasn't met anyone from [my] side of the family or spent enough time with them. So I'm confused by your questions.
>
> Like wouldn't you want your — If you have, you know, a daughter or a son, wouldn't you want them to see your husband's side of the family at all like or would you deny them? I'm confused by your question . . . .

{¶ 48} Father explained that A.N. "visits" with his family in India via Zoom, WhatsApp and FaceTime, but questioned whether that should be "justification to say . . . let her meet them through Zoom until she turns 18." Mother's counsel then asked Father, "How is it in A.N.'s best interest to be spending time with an elderly person with dementia." Father explained that his grandmother was 95 years old and "has early signs of dementia." Father answered that his grandmother has "told me time and time again . . . I have one request before I die, that is to see my [great-] granddaughter. Okay? If she can tell me that every time, her memory is pretty sharp."

### C. The GAL

{¶ 49} The GAL did not testify under oath at this hearing but the court asked the GAL to give her opinion regarding international travel and A.N.'s passport. The GAL stated that she thought Father should be in charge of renewing and maintaining A.N.'s passport. The GAL further stated that A.N. is "adamant about wanting to go to India." According to the GAL, Zoom and Facetime are "great supplement[s], but there's nothing like being there and having your grandma hug you." The GAL

suggested that the court "give Father a little more" time because A.N. missed the opportunity to attend his wedding and spend time with her family in India.

## III. Law and Analysis

### A. Modification of Parenting Plan

{¶ 50} In Mother's first two assignments of error, she argues that the court abused its discretion by modifying the Parenting Plan without the statutorily required best-interest analysis. For ease of discussion, we review these two assignments of error together.

#### 1. Standard of Review

{¶ 51} We review a trial court's modification of a shared parenting plan for an abuse of discretion. *In re I.L.J.*, 2023-Ohio-2960, ¶ 43 (8th Dist.). An abuse of discretion is "a court exercising its judgment, in an unwarranted way, in regard to a matter over which is has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

#### 2. Best Interest of the Child

{¶ 52} Under R.C. 3109.04(E)(2)(b), the court may modify the terms of a shared parenting plan "if the modifications are in the best interest of the" child. *See Fisher v. Hasenjager*, 2007-Ohio-5589, ¶ 33. In determining the best interest of the child in this situation, courts should consider the following factors found in R.C. 3109.051(D):

> (1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;

(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

*See also In re I.L.J.*, 2023-Ohio-2960, ¶ 39 (8th Dist.), citing *Campana v. Campana,* 2009-Ohio-796, ¶ 3 (7th Dist.) ("[T]he best interest factors listed in R.C. 3109.04(F)(1) are used only for custody modification motions; the best interest factors in R.C. 3109.051(D) are applied to parenting time and visitation modifications."); *Motes v. Motes*, 2026-Ohio-307 (12th Dist.), ¶ 28 ("R.C. 3109.051

governs parenting time and visitation, and a trial court modifying parenting time must consider the factors enumerated in R.C. 3109.051(D).").

### 3. Analysis

{¶ 53} In ruling on Father's motion to modify the Parenting Plan, the trial court noted that it considered the magistrate's decision, Mother's objections to the magistrate's decision, the transcript of the March 25, 2025 hearing and the GAL report. The trial court did not expressly state in its journal entry which statutory best interest factors it relied on in making its decision. This court has held that absent evidence to the contrary, "a reviewing court will presume that the trial court considered the relevant statutory factors." *In re I.R.Q.,* 2018-Ohio-292, ¶ 15 (8th Dist.). In this case, the court found that modification of the Parenting Plan was in A.N.'s best interest.

{¶ 54} Rather than focus on the best interest of A.N., Mother's appellate brief appears to focus on evidence and testimony in the record that the court did not address in its journal entry. For example, Mother stated in her brief as follows: "Yet the juvenile court's entry never addresses Father's new wife and stepson in India, his remote-work arrangement, or Mother's Hague-Convention [sic] testimony in assessing best interest."

{¶ 55} Upon review of the trial court's application of the best-interest factors, we find the following: The court noted that Mother's main concern appeared to be that Father would not return A.N. to the United States if he is permitted to travel internationally — and particularly, to and from India — with A.N. The court

found that the parties originally contemplated in the Parenting Plan that Father would take A.N. to India.

{¶ 56} However, the court found as follows: "[I]t is apparent reading the transcript that the mother did not cooperate with the . . . Parenting Plan . . . contemplating [A.N.'s] attendance at her father's wedding; that she was not a cooperative witness; and that she would obstruct any travel to the father's home country of India no matter the circumstances." The court further found that Mother admitted she was "not going to cooperate with [A.N.] going to India" during the following part of her testimony:

Q:     The motion to modify the shared parenting plan and the motion for the . . . temporary orders were only filed after it was clear in an email from [Father] that you were not going to allow this to happen, you were not going to cooperate with the child going to India?

A:     Yeah, there was a change of circumstance.  Yes.

Q:     Okay.  And that change of circumstance was basically saying it's not going to happen?

A:     The change of circumstance was him being married and wanting to be in India.

{¶ 57} Despite Mother's belief, the court found that evidence and testimony demonstrated that Father intended to remain in the United States.  This included his testimony that he returned from India with A.N. once already in 2017; he obtained his green card, which allows him to stay here for longer periods than under his previous visa; he works for a United States-based company; his ability to work remotely is limited; he intends to become a United States citizen and bring his wife

here; and his first priority is being here for A.N. and to see her grow up. The GAL report states that the GAL has "no reason to believe that Father does not intend to have [A.N.] return to the United States." The GAL also stated at the hearing that her recommendation was that A.N. be allowed to travel internationally with Father.

{¶ 58} Additionally, the court found that "Mother chose to strictly and selectively follow parts of the [Parenting Plan], to the detriment of" A.N. For example, A.N.'s passport expired in 2022, it was Mother's clear duty under the Parenting Plan to renew A.N.'s passport and Mother did not do this. Mother was asked multiple times if she renewed A.N.'s passport. Mother evaded answering the question until the court admonished her and stated, "I think the answer would have been, no, it's not been renewed." Mother was also asked multiple times why she did not renew A.N.'s passport. Again, Mother avoided answering the question. Ultimately it was established that, as of the time of the hearing, A.N.'s passport has still not been renewed.

{¶ 59} As another example of Mother not being reasonable, the court noted that, in Mother's opinion, the Parenting Plan permitted Father to take A.N. to India for one day to attend his wedding. The court found that one day of international travel was not a reasonable solution. The court further found that Mother coached A.N. prior to A.N.'s meeting with the GAL and debriefed A.N. after the meeting with the GAL.

{¶ 60} Furthermore, evidence in the record shows that Mother demanded verification that Father was getting married when nothing in the Parenting Plan

required this and Mother told Father his first two attempts at verification were essentially not good enough. The court further found that Father wanted A.N. to experience Indian culture and tradition and to meet paternal family members, in person.

{¶ 61} This case has an unusual fact pattern in that control of A.N.'s passport and the terms of international travel with A.N. are the only disputed issues and the reason these issues are in play is because Mother failed to comply with the Parenting Plan. Mother cites a string of Ohio cases to support her arguments that the court failed to engage in a best-interest analysis regarding these disputed issues. However, our review of Mother's cited cases shows that, for the most part, these cases concern initial custody determinations — or the allocation of parental rights and responsibilities — after a divorce. *See, e.g., Ibrahim v. Ibrahim*, 2013-Ohio-5401, ¶ 4 (10th Dist.) (affirming sole custody of the child to mother because, in part, "[n]o credible evidence was presented that Defendant Mother is a flight risk or that reasonable international travel with [the child] should not be permitted"); *Grover v. Dourson*, 2019-Ohio-2495, ¶ 60 (12th Dist.) (affirming sole custody of the children to mother and placing the children's passports with the GAL, in part, "[g]iven the magistrate's disbelief that Mother intended to take the children to India, and that Mother has since integrated herself, and the children, into the community, potential abductions appears unlikely").

{¶ 62} Most of the cases cited by Mother do not concern modification of a shared parenting plan. This matters because these cases do not analyze situations

in which one parent failed to comply with an agreed shared parenting plan, which is the fact-pattern presented in this case. In *Fisher v. Hasenjager*, 2007-Ohio-5589, the Ohio Supreme Court explained the difference between custody orders and shared parenting plans: "The standard in R.C. 3109.04(E)(2)(b) for modification of a shared-parenting plan is lower because the factors contained in a shared-parenting plan are not as critical to the life of a child as the designation of the child's residential parent and legal custodian." *Id*. at ¶ 36.

{¶ 63} Accordingly, we find the law cited by Mother in her appellate brief to be inapposite to the facts and procedural posture of this case.

{¶ 64} In reviewing the statutory best-interest factors that are applicable in this case, we find that evidence in the record points to R.C. 3109.051(D)(10) and (13). The record is replete with evidence that Mother was unwilling to facilitate Father's parenting time as it pertained to A.N. traveling to India and Mother continuously, and willfully, denied Father the right to travel with A.N. to India, in direct defiance of the Parenting Plan. Furthermore, Mother failed to renew A.N.'s passport, which was her responsibility under the Parenting Plan.

{¶ 65} Accordingly, we cannot say that the court abused its discretion by ordering Father to be in charge of A.N.'s passport and expanding the conditions under which Father is permitted to travel internationally with A.N. Mother's first and second assignments of error are overruled.

## B. Manifest Weight of the Evidence

{¶ 66} In Mother's third and final assignment of error, she argues that the court's judgment is against the manifest weight of the evidence particularly because of the "court's cursory treatment of Mother's evidentiary objections and its reliance on Father's exhibits . . . while ignoring undisputed evidence" submitted by Mother. Most of the arguments under this assignment of error mirror Mother's arguments under her first two assignments of error, of which we disposed in this opinion. To the extent that this assignment of error alleges that the court improperly admitted Father's exhibits, we find no abuse of discretion. The juvenile court allowed Father's exhibits to be admitted into evidence because these exhibits had been previously provided to Mother.

{¶ 67} Mother states under this assignment of error that the court "did not analyze admissibility under the Rules of Evidence or address Mother's substantive objections." However, Mother fails to cite any Rules of Evidence in her appellate brief, and she fails to discuss or even mention her "substantive objections" to the admissibility of Father's exhibits. Pursuant to App.R. 12 and 16, which require legal citations in appellate briefs to support assignments of error and arguments, we disregard this argument under this assignment of error. *See Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.) ("An appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A)(7).").

{¶ 68} To the extent that Mother uses her third assignment of error to repeat arguments she made under her first two assignments of error, we stand by our analysis in the previous section of this opinion.

{¶ 69} Mother's third assignment of error is overruled.

{¶ 70} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, P.J., and
TIMOTHY W. CLARY, J., CONCUR